ROBERT JOHNSON, TRUSTEE, APPELLEE, V. SHERMAN COUNTY IRRIGATION, WATER POWER AND IMPROVEMENT COMPANY, APPELLANT.

FILED MARCH 17, 1904. No. 13,453.

1. **Appeal: REVERSAL.** Where, upon appeal of a suit in equity, the decree of the trial court in favor of the plaintiff is reversed and the cause remanded for further proceedings upon amended pleadings, nothing has become *res judicata*, or the "law of the case" binding on the trial court, except that the pleadings and evidence on the first appeal did not authorize the decree.

2. **Appurtenances.** The ruling made on the former appeal, that, "Where a mill is erected and a water-power obtained by the aid and cooperation of adjoining landowners, any right of flowage

over their premises of water for the mill arranged for and contemplated by the owners, as subscribers toward its construction, becomes appurtenant to the mill," reannounced.

3. **Easement:** PAROL AGREEMENT. If one owning land traversed by a stream sells a portion thereof to another, and at the same time gives such other person by parol the right to overflow the remainder of the land by erecting a dam on the land so conveyed, and the purchaser, relying on such parol agreement, erects such dam and a mill operated by water, and maintains the same, the parol agreement becomes enforceable. If viewed as a license, the acts of the purchaser render the license irrevocable. If viewed as an easement, they take the grant out of the statute of frauds. *Newcomb v. Royce*, 42 Neb. 323, followed.

4. **Conveyance:** CONSIDERATION. The above rule applies as well where the mill site is conveyed in consideration of the erection of the mill, as where other consideration is paid therefor, and where the privileges given consist of other beneficial rights necessary to the use of the mill.

5. **Mortgage Foreclosure:** SHERIFF'S DEED: EASEMENTS. Where a sheriff's deed, made as the result of foreclosure of a mortgage, properly conveys realty consisting of mill property together with the appurtenances thereto belonging, the easements appurtenant to the mill property and necessary to its use and enjoyment, owned and used by the mortgagor in connection therewith at the time of the foreclosure, pass as appurtenances to the mill property.

6. **Lease:** STATUTE OF LIMITATIONS. Where, after conveyance of such property by sheriff's deed, the premises are leased by the purchaser to the mortgagor, possession of any portion of the property or its appurtenances, derived by third persons from the tenant, will not stop the running of the statute of limitations in favor of the lessor's title.

7. **Review:** DECREE. Record examined, and *held* to authorize the decree except as modified herein.

8. **Easement:** RIGHTS OF OWNER. An easement consisting of the right to maintain a mill-pond upon the land of another, does not deprive the owner of the land of any use thereof which does not interfere with the enjoyment of the easement.

APPEAL from the district court for Valley county: JOHN R. THOMPSON, JUDGE. *Reversed with directions.*

*R. J. Nightingale,* for appellant.

*O. A. Abbott, contra.*

GLANVILLE, C.

This case is before the court a second time on appeal by the defendants, having been once reversed by an opinion

found in 63 Neb. 510, wherein it was remanded for further proceedings. A general statement of the matters in dispute is found in that opinion, to which we refer, mentioning herein only such other matters as are now involved. A new trial was had upon new pleadings, and new findings and decree were made in plaintiff's favor, different in some regards from the original decree. It is herein contended by defendants that certain matters retried by the district court had become *res judicata* by our former decision, and we take up this contention first. The question involved in this case is, what rights passed to the plaintiff by a judicial sale of the mill property involved, as appurtenances thereto? To be more specific, the rights in dispute are the rights, claimed by the plaintiff to have so passed, to flow land north of the mill site as a part of the mill-pond, the fee to which land was purchased by the mortgagor after the date of the mortgage which is the basis of the plaintiff's title, but which land was then so flowed; also the right to use a portion of the mill-race as then actually constructed, not upon land to which the mortgagor ever acquired the fee, together with a right to take water from the river in connection therewith. We think the scope and extent to which our opinion on the former appeal goes, as adjudicating the rights of the parties herein, is fairly shown by the following excerpts therefrom. "Plaintiff alleges an agreement, oral or in writing, between the various owners of the property affected and Schaupp, in the spring of 1887, to make to Schaupp an absolute title to the strip of land constituting the present race-way in consideration that Schaupp should erect the mill." "As before suggested, the question raised is as to the existence of title in the plaintiff to the strip of land claimed for a head-race in the north half of the section, and also as to the extent and character of the water right possessed by plaintiff." "It seems clear that the decree as it stands can not be sustained. It gives a degree of control to the mill-race as it now exists which only belongs to one who holds in fee. As above stated, the evidence is very far

from disclosing any such title in any portion of the north half of the section on the part of plaintiff." "The state of facts in this case warrants no finding of an absolute and exclusive right in plaintiff to the dam and to the raceway, with its tow-head and sluice in the north half of the section." "It seems, however, clear that there was during all the time from 1887 until the irrigation company's purchase, with only temporary interruptions, some use of water privileges by the mill." "It would seem that plaintiff's rights in the premises depend upon something neither alleged nor shown by the evidence with any definiteness, viz., the rights held by John G. Schaupp in this mill-race and water-power on November 21, 1887, at the time the deed was made to Charles Moore and August Schaupp for his benefit, and the mortgage executed by them." "Some prior right to draw water from the river over the original race-way, as contemplated at the time of the subscription agreement, and as conveyed by Wall, with a right to condemn for additional race-way and mill-pond, and, when that is done, to have so much use of the water, seems to be the extent of plaintiff's rights. To vindicate them will evidently require an amended petition and a new trial. It is therefore recommended that the decree of the district court be reversed and set aside, the injunction dissolved, and the cause remanded for further proceedings. By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is reversed and set aside, the injunction dissolved, and the cause remanded for further proceedings. Reversed and remanded."

We are persuaded, and so hold, that plaintiff had, when the cause was thus remanded, a right to amend his pleadings by alleging any facts that would show any lawful right he claimed touching the things in controversy, and to introduce any competent evidence to establish those facts; that he was neither confined to, nor precluded from using the allegations in the former pleadings, nor the evidence produced on the former trial; that he might in the new trial prove any fact material to his rights,

whether he had pleaded and failed to prove them before, or only failed to plead them. What was decided on the former appeal is, that the case made by the pleadings and evidence did not warrant the decree. If the pleadings and evidence now show that any of the rights in dispute belong to the plaintiff, he is entitled to have them awarded by the new decree.

The findings and decree now before us are specific and somewhat lengthy, covering 16 type-written pages. No good purpose would be subserved by copying the same or making any very close analysis thereof. The findings of fact justify the conclusions of law, so far as they are favorable to the plaintiff, under the rule announced in our former opinion: "Where a mill is erected and a water-power obtained by the aid and cooperation of adjoining landowners, and right of flowage over their premises of water for the mill arranged for and contemplated by the owners, as subscribers toward its construction, becomes appurtenant to the mill." And in *Newcomb v. Royce,* 42 Neb. 323: "If one owning land traversed by a stream sells a portion thereof to another, and at the same time gives such other person by parol the right to overflow the remainder of the land by erecting a dam on the land so conveyed, and the purchaser, relying on such parol agreement, erects such dam and a mill operated by water, and maintains the same, the parol agreement becomes enforceable. If viewed as a license, the acts of the purchaser render the license irrevocable. If viewed as an easement, they take the grant out of the statute of frauds." There can be no question but that the mill-race as now located is throughout nearly its entire length precisely where all the parties originally understood and agreed that it should be. It follows a natural channel that was the cause of the selection of the locality for a water-power. The contention that it was intended to tap the river further south is based upon the calls in a deed made after the channel was excavated. Such route was never surveyed or worked. There appears to have been a mis-

take or misunderstanding in regard to these calls because they are made with reference to some wrong variation from the magnetic pole, but the only right of way given and used, or surveyed, is where the race is located. That is the route intended by the deed from Wall, and is where the new decree fixes the right of way. The mill-race across the land known as lot 2 in the section in question, or the Fries tract, is where it originally was, except that a sharp bend made on land so low that the banks would not always hold the water, was avoided by cutting across the bend on a little higher ground. This land was owned by John Wall when the agreement was made to furnish such right of way, to secure the location and erection of the mill. Schaupp's proposition was to build the mill for a donation of money, a mill site and "sixty feet for the head-race *to the mouth of the channel.*" It appears from the findings of the court, which are supported by sufficient evidence, that Fries purchased this property from John Wall after the agreement with Schaupp to give the right of way for the mill-race; that Fries knew of the agreement and purchased the land without asking for its repudiation, allowed the mill-race to be dug in accordance with such agreement without objection, and the reason that no reservation of the right of way for the mill-race was placed in the deed from Wall to Fries, was not because of any mistake as to the location of the mill-race, for it was known that it would follow a well defined channel to the river, but because of a belief by both Wall and Fries that the land sold did not cover any part of that channel. Fries bought with knowledge of Schaupp's right in the premises under the contract with Wall, allowed valuable improvements to be made, based upon those contract rights, without objection, and is, we think, estopped to deny Schaupp's right to the mill-race. Perhaps he should even be held trustee of the legal title for Schaupp, or be required to specifically perform Wall's contract. Wall, under the evidence and findings, and the rules announced by this court above referred to, was

458 • NEBRASKA REPORTS. [Vol. 71

Johnson v. Sherman County Irrigation, Water Power and Improvement Co.

bound by his contract. Fries bought with a knowledge of
all the facts, and therefore subject to the contract. The
fact that when he bought he did not suppose his tract
extended over any of the channel in question is imma-
terial, he knew of Schaupp's right to that channel.

The mill-race proper enters the land of Fries about 220
feet west of its southeast corner, runs nearly west-north-
west some 600 feet, and connects with a natural channel
of the Loup river which extends about northwest between
the main land and an island, up beyond the Fries tract,
and across the southwest corner of a tract then belong-
ing to one Rounds, to the head of the island. The use of
this channel was a necessary part of the proposed water-
power scheme, and had been promised by the owners of
the property throughout its entire length to Schaupp,
in consideration of his locating and erecting the mill.
At the time the mortgage herein referred to was
taken, Rounds told the agent of the creditor who
took the security "that he had agreed that Mr. Schaupp
might use that water through there." That carries the
right to the use of that channel down to where the chan-
nel entered the land of Wall, who was one of the active
parties in securing the location of the mill, and had
promised the use of the water in the channel, and the right
of way from it for the mill-race.

There is another reason why the defendants can not
prevail as to the right of way across the Fries tract. By
Fries' testimony, Schaupp excavated the channel across
his land in June, 1887. Schaupp remained in undisputed
possession, and used the channel as an appurtenance to
the mill, down to the time of the foreclosure sale, and
whatever interest he had was appurtenant to the mill and
passed by the sheriff's deed. Schaupp leased the property
from the plaintiff, and was in possession of the entire
plant under the lease. Whatever possession, if any, the
defendants had in the ditch during the continuance of
such lease, they acquired from Schaupp by contract,
knowing him to be in possession as plaintiff's tenant.

They could not hold possession so acquired adversely to plaintiff, especially without notice to him.  Schaupp's possession under the lease continued until in July, 1897. Prior to that time, defendants holding their possession under plaintiff's lessee, were holding under plaintiff, and were estopped to claim adversely to the plaintiff, until they had surrendered the possession. At the time Schaupp surrendered his lease, the ten years' statute of limitations had fully run, and plaintiff's title to an easement of right of way for the mill-race had ripened under the statute. All of the rights which the new decree gives the plaintiff in the mill-race and works above the mill and mill-pond were, we think, clearly appurtenant to the mill at the time of the foreclosure sale, and passed as against the defendants by the sheriff's deed.

Turning now to the question of the rights of the parties as to the land north of the mill site flowed by the mill-pond within the high banks of Hawthorne creek, we find that the race discharges the water into the pond.  That the mill wheel is fed from the pond is shown by the maps and diagrams of both parties.  To fill the pond is impossible without flooding the land, and to use the power for the mill is impossible except the pond be filled.  When Schaupp created the pond for the use of the mill, partly on the mill site and partly above it, the pond became an appurtenance to the mill, necessary and appropriate for use in connection therewith.  If he had obtained title to the easement by donation toward the enterprise, it would have gone with the mill as an appurtenance. Having created the pond for use of the mill and then purchased the land it covers, while the fee in the land would not pass by sale of the mill and site, yet the easement of right of flowage, we think, would pass as an appurtenance to the mill property. The fact that Schaupp perfected his right to flow the land after the giving of the mortgage would not prevent it from so passing, the same as other betterments to the land in the form of buildings and machinery afterwards added to the premises, would so pass.  Its use in connec-

tion with the mill was open and visible. It was an *apparent* easement as that term is used in law. If Schaupp had owned and sold the mill at the date of the sheriff's deed, the easement would have passed by an implied grant. The owners of the fee continued to have the right to make use of the land in any way that did not lessen the enjoyment of such easement, but the mill property is the dominant estate. The decree gives plaintiff only such an easement. We are satisfied with the holdings of this court above. referred to, and are content to follow them without further argument, and, applied to the facts in this case, we think they support the findings and decree of the lower court.

The trial court limited the rights of the plaintiff in the disputed property to such use as will yield for the mill 15 horse-power through the water power plant, upon the theory, as we understand, that our former decision prevented its giving to plaintiff a right to any greater flow than had been obtained at the date of the foreclosed mortgage. We do not so understand the matter. The donations of the rights acquired by Schaupp were for the mill he proposed to build. Though he had not at the date of the mortgage acquired sufficient flow to give him power to run the mill to its full capacity, if he had done so afterwards under the subscription agreement, we think he could not deprive the mortgagee of the power acquired and used in operating the mill, after sale of the mill and appurtenances under foreclosure. Mr. Schaupp, as a witness for the defendants, testified that soon after he turned the water to the wheel he could grind at "half capacity," and that the capacity of his mill required 40 horse-power. While he also testified that his first wheel would develop but 15 horse-power under a three foot fall, he also testified that he in some manner increased the fall and the power obtained. We think it well established from the evidence that the fall obtained is greater than three feet, and do not think the limitation of plaintiff to the use of 15 horse-power is just, under the evidence,

neither do we think the plaintiff has well established his right to the use of more water than is sufficient to develop 20 horse-power under the fall obtained.

The decree rendered preserves the rights of the parties in a joint use of the property, and water, and water right to the extent that such joint use is proper and right under the evidence, and should, we think, be affirmed except in the following particular. A joint use of the mill-pond as a reservoir seems necessary to the enjoyment of the several rights of each party, and is, we think, intended to be given by the decree. The plaintiff has only an easement to maintain the pond at its accustomed height; the enjoyment of such easement would not be disturbed by the defendants' use of the property, in which they own the fee, for the purpose of allowing water to flow in and out, provided they do not interfere with plaintiff's maintaining the pond at such height as to give him the power he is found to be entitled to. By the decree, before the defendants can so use the mill-pond, they will be compelled to make a canal on their own premises, diverging from the present canal and mill-race at the point where the present race enters the south half of the section, and a device to measure the water to which plaintiff is entitled is required to be placed at this point of divergence, to be maintained at the equal and joint cost of plaintiff and defendants. Plaintiff's mill-race discharges into the pond; if defendants' canal shall also discharge into the pond, it would be useless to measure the water which flows through plaintiff's separate mill-race. It must be true that the plaintiff, by knowing the capacity of his water wheel, may also know the height to which the water must be maintained in his flume to give him the specific power to which he has been found to be entitled. Instead of providing a measuring device, we think the decree should be modified so as to allow the plaintiff to use the quantity of water necessary to furnish such power, and to restrain him from using water in excess of such amount.

The decree should be so modified as to allow the plain-

tiff the use of sufficient water to develop 20 horse-power instead of 15, also, so as to require the plaintiff to pay two-fifths instead of one-third of the cost of keeping up the plant, as provided by the decree; and further, by striking out the provision for maintaining a measure device, and, instead thereof, entering an order restraining the plaintiff from using more than the quantity of water required to produce 20 horse-power under the fall obtained by maintaining the pond at its accustomed height, this restriction, however, to take effect only after the defendants shall become entitled to the use of the pond by making their own canal leading thereto as provided by the decree. In all other respects, the decree should be affirmed.

We therefore recommend that the cause be remanded, with direction to the district court to modify its decree in the above particulars only, the decree to stand as entered in all other respects.

FAWCETT and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, it is ordered that this cause be remanded, with directions to the district court to modify its decree so as to allow the plaintiff the use of sufficient water to develop 20 horse-power instead of 15, also, so as to require the plaintiff to pay two-fifths instead of one-third of the cost of keeping up the plant, as provided by the decree; and further, by striking out the provision for maintaining a measuring device, and, instead thereof, entering an order restraining the plaintiff from using more than the quantity of water required to produce 20 horse-power under the fall obtained by maintaining the pond at its accustomed height; such restriction to take effect only after the defendants shall have become entitled to the use of the pond by making their own canal leading thereto in accordance with the decree; and in all other respects, that the decree stand affirmed.

JUDGMENT ACCORDINGLY.